J-S29017-17

2017 PA Super 266

| DESIREE REASON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| KATHRYN'S KORNER THRIFT SHOP, DRUEDING CENTER, INC., HOLY REDEEMER HEALTH SYSTEM, TAMIKA THOMAS A/K/A TAMIKA RILEY AND NADINE RILEY | |
| | No. 1866 EDA 2016 |

Appeal from the Judgment Entered May 25, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 140701113

BEFORE: LAZARUS, J., SOLANO, J., and STEVENS, P.J.E.[*]

OPINION BY SOLANO, J.:                    **FILED AUGUST 17, 2017**

Following the entry of judgment against defendant Tamika Thomas,[1] Appellant Desiree Reason challenges the order granting summary judgment in favor of the remaining defendants, Appellees Kathryn's Korner Thrift Shop, Drueding Center, Inc., Holy Redeemer Health System, and Nadine Riley, with respect to an alleged assault that occurred while Reason was shopping at the thrift shop. We affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] There is confusion in the record regarding the names of some of the individuals involved in the matter at issue. The record refers to defendant Nadine Riley's daughter as "Tamika Thomas," but Riley testified that her daughter is named "Tamika Riley," not "Tamika Thomas." Nadine Riley Dep. at 24-25. Nevertheless, to adhere to the complaint and thereby avoid further confusion, we refer to the daughter as Tamika Thomas.

The incident that gives rise to this suit occurred on September 19, 2012, at the thrift shop's location on North Lawrence Street in Philadelphia. Trial Ct. Op. at 3. Those premises are owned by Drueding Center, which, in turn, is owned by Holy Redeemer. Reason went to the thrift shop as a business invitee, and she was a frequent customer of the shop.

Riley is the cashier at the thrift shop, and Riley's daughter, Tamika Thomas, was at the thrift shop at the time of the incident. Thomas was a monthly visitor to the thrift shop, but was not a thrift shop employee. Thomas has a history of mental illness, but there is no evidence in the record that she has a history of violence. Riley Dep., 10/16/15, at 28-29. Reason alleged that Thomas takes daily medication for her condition, but that she failed to take her medication on the day of the incident and that Riley knew of that lapse.

According to Reason, the incident occurred when she brought items to Reilly's check-out counter. She made some purchases and left other items on the counter. Thomas, who was standing in front of the register at this time, accused Reason of throwing socks at Reilly and punched Reason in the face. Reason and Thomas left the store and began to fight outside. Trial Ct. Op. at 3-4 (citations omitted).

Riley claims that she pushed a button in the store to summon help. Riley says she believed that the button directly summoned the police, but the button instead may have been wired to alert someone at the reception

- 2 -

desk of Drueding, who then called another employee, Calvin Collins, to check on the alert. *See* Calvin Collins Dep., 10/16/15, at 9-10.

About ten minutes after Reason and Thomas left the store, Riley followed them outside and made a phone call on her cell phone. She claims to have called the police. *See* Trial Ct. Op. at 8; Riley Dep. at 34. Meanwhile, three men on bikes arrived on the scene and held Reason down while Thomas punched her and Reason punched back. Trial Ct. Op. at 4. Store employees stood outside and watched the fight but did not participate in it. Collins then interceded and broke up the fight. Later, the police arrived, and Reason brought them into the store. *Id.*; *see* Riley Dep. at 34.

On July 11, 2014, Reason initiated this action. As amended, her complaint made claims against the Thrift Shop, Drueding, Holy Redeemer, Riley, and Thomas for negligence, false imprisonment, and civil conspiracy; she also sued all defendants except Riley for assault and battery, sued all defendants except Thomas for concerted tortious conduct, and sued all defendants except Riley and Thomas for negligent hiring and supervision. Fourth Am. Compl., 2/2/15, at 7-19 ¶¶ 27-85.

On November 2, 2015, all of the defendants except Thomas moved for summary judgment. They contended that they did not breach any duties owed to Reason, did not cause her any physical harm or place her in fear of harm, did not conspire to cause her harm or aid and abet anyone who allegedly injured her, and did not negligently hire or supervise any

employees.  Appellees' Mot. for Summ. J. at 4-32 (citing Counts I, III-VIII of Fourth Am. Compl., 2/2/15, at 7-19 ¶¶ 27-29, 32-85); Mem. of Law in Supp. of Appellees' Mot. for Summ. J. at 5-14.[2]  On December 17, 2015,[3] the trial court granted the motion for summary judgment, leaving Thomas as the sole defendant in the action.

On January 8, 2016, the case against Thomas was listed for arbitration.  Thomas did not appear at the arbitration, and on April 14, 2016, the arbitrators entered a report and award against Thomas and in favor of Reason in the amount of $40,000.00.  Report & Award of Arbitrators, 4/14/16, at 1.  On May 25, 2016, Reason filed a praecipe to enter judgment against Thomas in that amount.

On June 9, 2016, Reason filed a notice of appeal to this Court.  In a Rule 1925(b) statement, she challenged the trial court's entry of summary judgment in favor of the defendants other than Thomas.  On December 16, 2016, the trial court filed a Rule 1925(a) opinion in which it expressed the view that Reason had waived her right to appeal by failing to file her notice

---

[2] The movants also argued that there was no evidence to support an award of punitive damages.  Appellees' Mot. for Summ. J. at 32-34 (citing each ad damnum clause in Fourth Am. Compl., 2/2/15, at 7, 10-14, 16-17, 19); Mem. of Law in Supp. of Appellees' Mot. for Summ. J. at 14-15.

[3] Although the order was dated December 17, 2015, it was not docketed until December 23, 2015.  The trial court and the parties use December 17 as the date of the order, and we therefore do the same.

of appeal within 30 days of the court's December 17, 2015 summary judgment order. Reason now raises the following issues:

1.    Did [Reason] file a timely Notice of Appeal when said Notice was filed within thirty days after the final Order disposing of all parties to this action?

2.    Did the trial court err as a matter of law by granting summary judgement and holding that [Reason's] claims against Kathryn's Korner Thrift Shop, Drueding Center, Inc., Holy Redeemer Health System and Nadine Riley, are without merit?

Appellant's Brief at 3 (issues renumbered; suggested answers omitted).

**Timeliness of Reason's Appeal**

In its opinion, the trial court stated that Reason's appeal was untimely, and that all of her issues therefore were waived, because the notice of appeal was not filed within 30 days of the order granting summary judgment. Trial Ct. Op. at 5. Reason contends that she filed a timely appeal following entry of the judgment against Thomas, the final defendant in the case. Appellant's Brief at 11. She continues that "[t]he [trial c]ourt's Order of December 17, 2016 was not a final Order as it did not dispose of all claims of all parties in accordance with Pa. R. A. P. 341(a)(1)." *Id.*[4] Reason is correct.

Pennsylvania Rule of Appellate Procedure 341(a)(1) states: "an appeal may be taken as of right from any final order of a government unit or trial court." Pa.R.A.P. 341(b)(1) defines a "final order" as "any order that

_____

[4] Appellees "agree that [Reason] timely filed the Notice of Appeal after the entry of a final order in the underlying litigation." Appellees' Brief at 19.

- 5 -

. . . disposes of all claims and of all parties." The trial court granted Appellees' motion for summary judgment on December 17, 2015. Subsequent to the granting of that motion, outstanding claims remained pending against Thomas. Thus, the order granting summary judgment was not a final order, because it did not dispose of all claims and of all parties. *See* Pa.R.A.P. 341(a); ***Brickman Grp., Ltd. v. CGU Ins. Co.***, 829 A.2d 1160, 1163-65 (Pa. Super. 2003). The remaining claims against Thomas were resolved upon entry of the judgment filed against Thomas on May 25, 2016. Hence, Reason could not properly file an appeal with this Court until after May 25, 2016, and her notice of appeal filed on June 9, 2016, was timely.

**Summary Judgment**

Entry of summary judgment is governed by Rule 1035.2 of the Rules of Civil Procedure:

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law
>
> > (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
> >
> > (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2. In addition:

> Our standard of review of an appeal from an order granting summary judgment is well settled: Summary judgment may be granted only in the clearest of cases where the record shows that there are no genuine issues of material fact and also demonstrates that the moving party is entitled to judgment as a matter of law. Whether there is a genuine issue of material fact is a question of law, and therefore our standard of review is *de novo* and our scope of review is plenary. When reviewing a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party.

*Newell v. Montana West, Inc.*, 154 A.3d 819, 821-22 (Pa. Super. 2017) (citations and internal quotation marks omitted).

Preliminarily, we note that Reason's Fourth Amended Complaint made claims of false imprisonment, civil conspiracy, assault, battery, concerted tortious conduct, and negligent hiring and supervision against Appellees, but Reason does not address any of these counts in her brief to this Court. She makes arguments only about her other negligence claims. *See* Reason's Brief at 6-10, 12. Any challenges to the trial court's summary judgment on the claims of false imprisonment, civil conspiracy, assault, battery, concerted tortious conduct, and negligent hiring and supervision are therefore waived. *See Signora v. Liberty Travel, Inc.*, 846 A.2d 145, 147 (Pa. Super. 2004) (when appellant's brief makes no argument in support of an issue, this Court will not consider the merits of thereof); *Moses Taylor Hosp. v. White*, 799 A.2d 802, 804 (Pa. Super. 2002) (issues addressed elsewhere but not argued in briefs are waived), *appeal denied*, 808 A.2d 572 (Pa. 2002);

*Butler v. Illes*, 747 A.2d 943, 944 (Pa. Super. 2000) ("When issues are not properly raised and developed in briefs, when briefs are wholly inadequate to present specific issues for review, a court will not consider the merits thereof").

With respect to her remaining negligence claims, Reason argues that the trial court "erred in entering summary judgment for [Appellees] as there exist[] genuine issues of material fact regarding whether [Appellees'] negligent conduct led to [Reason]'s injuries." Appellant's Brief at 6. Reason adds:

> [Reason] presents a *prima facie* case for negligence against the [Appellees] for violating their duty to [Reason] and genuine issues of material fact exist as to the [Appellees'] response to the incident and the foreseeable nature of the incident.
>
> [Appellees] owed [Reason] the same duty owed to all business invitees and whether their specific actions adequately satisfied or breached this duty is an issue to be determined by a jury. . . .
>
> [Reason] further contends that there are several instances where the actions, or non-actions, taken by [Appellees'] employees, both prior to the incident and during the incident, could permit a reasonable jury to infer that [Appellees] acted negligently and failed in their duty to [Reason] and that said failure is causally related to [Reason]'s resulting damages.

*Id.* at 7-9 (some formatting altered).

Under Pennsylvania law —

In order to hold a defendant liable for negligence, the plaintiff must prove the following four elements: (1) a legally recognized duty that the defendant conform to a standard of care; (2) the defendant breached that duty; (3) causation between the

- 8 -

conduct and the resulting injury; and (4) actual damage to the plaintiff.

***Newell***, 154 A.3d at 822 (quoted citation omitted).  Appellees contend that Reason's negligence claims fail to satisfy the first element, duty.  In response, Reason argues that Appellees owed her two legally recognized duties:  a duty to take precautions against the potential dangerous acts of third parties like Thomas; and a duty to aid or otherwise to respond adequately to the actual harms that were being committed against her by Thomas.  Appellant's Brief at 7, 9-10.  In other words, Reason contends that Appellees had a duty to prevent injury from Thomas' assault, and to come to Reason's rescue once the assault began.  We address each of these theories separately.

### *Duty to Protect against Acts of Third Persons*

Reason seeks to hold Appellees responsible for injuries caused by Thomas' assault because they "failed in their duty and were negligent in failing to remove unruly persons from the[ir] premises."  Appellant's Brief at 10 (citing Fourth Am. Compl., 2/2/15, at 9 ¶¶ q, v).  Reason continues that "[t]he [Appellees] negligently allowed Ms. Thomas to loiter on the premises and disregard[ed] what Riley admittedly knew about Thomas' prior mental health history and her knowledge that Ms. Thomas had failed to take her medication on the day of the [in]cident."  ***Id.***  Reason further asserts that "[t]he reasonable responsiveness to presently occurring conduct of third

persons is clearly within the scope of duties imposed on possessors of land under Section 344 of the Restatement of Torts, 2nd." *Id.* at 8.[5]

"Generally, there is no duty to control the acts of a third party unless the Defendant stands in some special relationship with either the person whose conduct needs to be controlled or . . . with the intended victim of the conduct, which gives the intended victim a right to protection." *Paliometros v. Loyola*, 932 A.2d 128, 133 (Pa. Super. 2007) (citation and internal quotation marks omitted). A "special relationship" exists between a business and its invitee. *Id.* (citing *T.A. v. Allen*, 669 A.2d 360 (Pa. Super. 1995) (*en banc*), *appeal denied*, 676 A.2d 1201 (Pa. 1996); Restatement (Second) of Torts § 314A(2)-(3) (1965)). In *T.A.*, we explained:

> [A]n invitee is described as follows:
>
>> (1) An invitee is either a public invitee or a business visitor.
>>
>> (2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.
>>
>> (3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with the business dealings with the possessor of the land.
>
> Restatement (Second) of Torts § 332. *Ott v. Unclaimed Freight Co.*, 395 Pa.Super. 483, 488, 577 A.2d 894, 896 (1990).

---

[5] Reason does not challenge the trial court's holding that Thomas was not an employee or agent of the thrift shop. *See* Trial Ct. Op. at 10.

- 10 -

*T.A.*, 669 A.2d at 363. As Reason was invited to enter and to remain at Kathryn's Korner for the purpose of doing business with the thrift shop, she was a business invitee and thus had a special relationship with Kathryn's Korner. For present purposes, we assume that relationship also extended to Drueding and Holy Redeemer.

This Court examined the duty to protect business invitees from the intentional or negligent acts of third parties in *Truax v. Roulhac*, 126 A.3d 991, 997-98 (Pa. Super.), *appeal denied*, 129 A.3d 1244 (Pa. 2015). The Court in that case observed that this duty is expressed in Section 344 of the Restatement (Second) of Torts, which states:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>
> (a) discover that such acts are being done or are likely to be done, or
>
> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

The Court in *Truax* explained:

> Comment f to Section 344 explains the duty to protect business invitees against third party conduct arises only if the owner has reason to anticipate such conduct.
>
> > *f. Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person

- 11 -

are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

Restatement (Second) of Torts § 344 cmt. f.

Consequently, Appellees owed Truax "a duty owed to any business invitee, namely, that [they] would take reasonable precaution against harmful third party conduct that might be reasonably anticipated." *Paliometros v. Loyola*, 932 A.2d 128, 133 (Pa.Super.2007) (citations omitted).

The reason is clear; places to which the general public are invited might indeed anticipate, either from common experience or known fact, that places of general public resort are also places where what men can do, they might. One who invites all may reasonably expect that all might not behave, and bears responsibility for injury that follows the absence of reasonable precaution against that common expectation.

*Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742, 745 (1984).

*Truax*, 126 A.3d at 997-98. Under *Truax* and similar cases,[6] Appellees had

a duty to exercise reasonable care to protect their business invitees,

_____

[6] *See Martin v. Rite Aid of Pa., Inc.*, 80 A.3d 813, 815 (Pa. Super. 2013) ("As possessors of land who hold it open to the public, [defendants] owe a duty to any business invitee, including Appellant, to take reasonable
*(Footnote Continued Next Page)*

- 12 -

including Reason, from harm that might result from the intentional or negligent acts of third parties if Appellees had reason to anticipate such conduct.

Reason contends that Appellees had cause to anticipate Thomas' intentional violent acts because Riley "knew about Thomas' prior mental health history and [knew] that Ms. Thomas had failed to take her medication on the day of the [in]cident." Appellant's Brief at 10. But the record does not support Reason's claim. No party presented any evidence that Thomas had a history of violence or that her mental health issues were related to violent behavior. To the contrary, while Riley admitted that Thomas had been voluntarily committed to a mental hospital on more than one occasion, the reason was that Thomas had been "overwhelmed with having three kids[; w]hen the father was killed right in front of his mother, that sent her over." Riley Dep. at 29. Riley testified that Thomas had not been involved in a physical altercation since she was a child. *Id.* at 28. Even though

_(Footnote Continued)_ ⸻

precaution against harmful third party conduct that might be reasonably anticipated" (citation and internal quotation marks omitted)); *Ovitsky v. Capital City Econ. Dev. Corp.*, 846 A.2d 124, 126 (Pa. Super. 2004) ("Under [Restatement] Section 344, . . . [defendant hotel] owed a duty to [business invitee] Ovitsky to take reasonable precaution against harmful third party conduct that might be reasonably anticipated" (citation and internal quotation marks omitted)); *Rabutino v. Freedom State Realty Co.*, 809 A.2d 933, 939-40 (Pa. Super. 2002) (duty to protect hotel patron from known rowdy crowd of underage hotel guests drinking alcohol); *cf. Kerns v. Methodist Hosp.*, 574 A.2d 1068, 1076 (Pa. Super. 1990) (lack of duty to protect deliveryman from unanticipated third-party attack at nursing residence owned by hospital).

Thomas had been in Kathryn's Korner about once per month before September 19, 2012, there had been no previous incidents. Riley Dep. at 10, 18, 27-28; *see also* Trial Ct. Op. at 11. The Drueding Center's vice president, Ann Marie Collins, who was in charge of the thrift shop, testified that she did not even know Thomas prior to the incident. Ann Marie Collins Dep. at 6, 10; *see also* Trial Ct. Op. at 11. Thus, in the words of the trial court, "There is nothing in the record to show that Thomas had a violent nature or that [Appellees] knew or should have known of the purported violent nature of Thomas." Trial Ct. Op. at 11.[7]

In the absence of any evidence in the record that Thomas had a history that would put Appellees on notice that she might engage in violent conduct, Reason's theory that Appellees had a duty to take precautions to protect against such conduct fails. Appellees had no reason to anticipate violent acts by Thomas against their business invitees, and therefore had no duty to protect Reason as a business invitee. *See Truax*, 126 A.3d at 997-98. In the absence of such a duty, Reason may not recover for negligence. *See Newell*, 154 A.3d at 822. Thus, the trial court properly entered summary judgment on this claim.

---

[7] It appears that Reason's claim is based on an unstated assumption that because Thomas had a history of mental health issues, she must be violent. The record contains absolutely no basis for such an assumption with respect to Thomas, and Reason provides no evidence to support a theory that all persons with a history of mental health treatment are potentially violent. Common knowledge is to the contrary.

### *Duty to Aid*

Second, Reason contends that Appellees' "duty to [her] as a business invitee included the duty to adequately respond to the actual harms that were being committed on [her]" by Thomas. Appellant's Brief at 7. Reason continues: "[Reason]'s fourth amended Complaint alleges that the [Appellees] were negligent in failing to properly assist and aid [Reason] while she was being assaulted. [Reason]'s Complaint further alleges [Appellees] were negligent in not contacting the police in response to this incident." *Id.* at 9 (citing Fourth Am. Compl., 2/2/15, at 8-9 ¶ 28(l), (u)). We conclude that on this claim too, Reason failed to state a viable legal claim that would prevent entry of summary judgment against her.

This Court considered a business' duty to come to the aid of a business invitee in *Campbell v. Eitak*, 893 A.2d 749 (Pa. Super. 2006). In *Campbell*, a patron who choked on a piece of chicken in a restaurant brought a negligence action against the restaurant, alleging that the restaurant failed to have policies and procedures in place for responding to a choking emergency and failed to administer appropriate first aid. *Id.* at 750. This Court affirmed the trial court's entry of summary judgment in favor of the restaurant, holding, as a matter of first impression, that the restaurant discharged its duty to its patron by summoning medical assistance within a reasonable time — "within minutes of Campbell's reported distress." *Id.* at 749-51, 753.

In reaching this conclusion, this Court rejected the duty of care set forth in the Restatement (Second) of Torts § 314A(3). **Campbell**, 893 A.2d at 752. Section 314A states:

(1) A common carrier is under a duty to its passengers to take reasonable action

(a) to protect them against unreasonable risk of physical harm, and

(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

(2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

Although Paragraph (1) of this section, the provision dealing with common carriers, was cited with approval in dicta by the Supreme Court of Pennsylvania in **Stupka v. Peoples Cab Co.**, 264 A.2d 373, 374 (Pa. 1970), the Commonwealth's decisional law had not embraced the other paragraphs of this provision regarding other types of business entities, and the Court in **Campbell** declined to do so with respect to the restaurant. Instead, relying on **Lee v. GNLV Corp.**, 22 P.3d 209 (Nev. 2001), and **Drew v. LeJay's Sportsmen's Cafe, Inc.**, 806 P.2d 301 (Wyo. 1991), the Court held that restaurant employees' "duty to aid" extended only to calling for professional

medical assistance within a reasonable time; the businesses did not owe a duty to provide first aid themselves. **Campbell**, 893 A.2d at 751-52.[8] We have not revisited the issue since that time.

Although **Campbell**, **Lee**, and **Drew** all involved provision of medical assistance to restaurant patrons, we see no reason to distinguish restaurant cases from others where business invitees require assistance.[9] Nor do we perceive a relevant distinction between the medical assistance required for the choking victim in **Campbell** and the assistance required for a victim of a physical altercation, as in this case. Just as a business is under no legal duty to don the mantle of a medical professional to attend to an invitee's

---

[8] The court in **Drew** gave several reasons for this result, many of which related to the extensive training requirements that imposition of a new duty to provide first aid would create for not just large-scale restaurants, but also "the 24-hour convenience store, grocery stores, movie theaters, and corner newsstand," as well as "all business-invitors, whatever products or services they offer to the public." 806 P.2d at 305. The court expressed concern about compelling lay employees "to perform first aid against their better judgment," rather than relying on rescue techniques performed by professional responders. **Id.** at 305-06.

[9] We have found no Pennsylvania case law — and neither party has provided any — discussing other types of businesses. With respect to providing medical assistance to patrons, courts in jurisdictions in addition to Nevada and Wyoming have agreed that that the duty of businesses other than restaurants is limited to promptly summoning professional medical assistance. **See**, **e.g.**, **L.A. Fitness Int'l, LLC v. Mayer**, 980 So. 2d 550, 552, 560 (Fla. Dist. Ct. App. 2008) (health club satisfied its duty to render assistance to the deceased as a matter of law when it promptly summoned professional medical assistance for him by calling 911), **review denied**, 1 So. 3d 172 (Fla. 2009); **Southland Corp. v. Griffith**, 633 A.2d 84, 85, 90-91 (Md. 1993) (convenience store owed business visitor "a legal duty to aid (call the police) when he requested assistance").

medical need, so too is a business not required to act as a policeman in the face of an ongoing assault. Indeed, imposing such a duty could place the business employees at risk of harm and impose liability on the business if its employees are injured. Although the alleged assault here consisted of fisticuffs between thrift shop patrons, it is not difficult to imagine more dangerous hostilities, perhaps involving firearms. Thus, based on **Campbell** and related case law and in the absence of any contrary authority provided by Reason, we agree that a business satisfies its duty to aid a business invitee by calling 911 or another source of professional medical or police assistance.[10]

Reason contends, however, that even if Appellees' only duty was to summon police, Appellees' breached that duty by failing to call for assistance in this case. Reason insists that genuine issues of material fact are in dispute because, although Riley claims she called the police after the altercation began, Reason has grounds to doubt that Riley or anyone else at the thrift shop actually did so. She bases those doubts on her contention that no police officers responded within any reasonable time after Thomas punched her. She adds:

> Riley's assertions about how she responded to this incident directly contradict [Reason]'s allegations. Accordingly, the credibility of Ms. Riley as a witness and her testimony regarding

---

[10] We note that, in her brief to this Court, Reason does not suggest any other actions that Appellees should have taken to render "aid" or "assistance" besides calling first responders. Appellant's Brief at 9.

the reasonableness of her response are issues that must be determined by a finder of fact.

Appellant's Brief at 9-10.

Riley claims she made two calls to summon authorities, first by way of an alarm button in the store, and then by using her cell phone. She testified as follows at her deposition:

Q. At any point did you consider calling the police?

A. I called the cops and it's a little button we have to push if something happens so I pushed the button.

Q. Is that an alarm or similar?

A. It's supposed to go straight to the cops.

Q. And then they're supposed to come directly there?

A. Yes.

Q. And you also called them on the phone?

A. Yes.

Q. How long was it before they arrived?

A. I don't know.

Q. Did the cops arrive at the scene of this incident?

A. When I seen the cops, she was bringing them into the store, Desiree.

Q. From your understanding, did the cops ever respond to the call that you placed?

A. I can't say. I don't know.

Riley Dep. at 33-34.

Despite Riley's professed belief that the alarm button sent an alarm "straight to the cops," it appears that the button instead may have been wired to notify a central desk at Drueding. **See** Trial Ct. Op. at 11. A Drueding employee, Calvin Collins, testified that he received a call from Drueding's "RA desk"[11] to alert him that "something was going on in front of the thrift store" and that he should investigate. In response to that call, Collins interceded and broke up the altercation. Calvin Collins Dep. at 9-10. We thus note that even if use of the alarm button did not succeed in calling the police, it did successfully summon assistance by someone who could end the confrontation and thereby rescue Reason from any ongoing attack — fulfillment of the duty that Reason claims was breached.

Regarding Riley's testimony that she made a second call to the police from her cell phone, the only other evidence in the record is deposition testimony by Reason herself that corroborates Riley's use of her cell phone to make a call. **See** Desiree Reason Dep. at 38-39 ("Nadine came out with the cell phone in her hand. She made a phone call."). When asked about the call, Reason testified:

> Q. When you came out of the store, when Nadine Riley made the call, do you know who she made the call to?
>
> A. No, I don't. I was outside while she was on the phone. I don't know who she was calling. I -- I thought she was calling the police.

---

[11] "RA" apparently stands for "reception area." **See** Calvin Collins Dep. at 13-14.

*Id.* at 39; *see id.* at 48-49. Reason cites no testimony that Riley did not call the police or called anyone other than the police.[12]

Reason contends that the police did not arrive at the thrift store while the altercation was taking place, and she argues that the failure of the police to promptly report to the scene is evidence that Riley did not actually call them. The facts relating to whether and when the police reported to the scene of the altercation are muddled. Riley testified that she saw the police at the scene of the incident when Reason "was bringing them into the store," and that they arrived within an hour of the incident. *See* Riley Dep. at 34; *see id.* at 40 (testimony that incident occurred between 1:00 and 1:30 p.m. and police arrived before 2:30 p.m.). When asked if the police were responding to her call, Riley stated, "I can't say. I don't know." *Id.* at 34. Calvin Collins stated only that he did not see police. *See* Calvin Collins Dep. at 18. Reason testified as follows:

Q. Okay. Did the police show up at any point?

A. No. I called the police. I went to the -- after the incident was over, I went to the Public Health Clinic, called the police, had the

_____

[12] At the same time as she testified about Riley's call, Reason testified that three men arrived at the thrift store on bikes and held her down while Thomas punched her. In the trial court, Reason claimed that Riley may have called those male assailants, but the trial court concluded, "there is no evidence of record to support the claim that Riley called three unknown assailants to the scene to hold Plaintiff down and enable the attack to continue." Trial Ct. Op. at 8. Our review of the record confirms the trial court's conclusion. Reason's brief does not repeat the claim that the men arrived as a result of Riley's call.

police go back around there with me because I had left my crutches in the store.

So I went around there to get my crutches and the police went inside, talked to Nadine and told me not to come back in the store anymore.

. . .

Q. I just wanted to grab the police report, ma'am.[13]  So we've taken a look at the police report and the police report, basically, states that you stated to the police that while inside Kathryn's Korner, that you got into a verbal dispute with the manager, Nadine Riley, over pricing; did that happen?

A. Uh-uh.

Q. Did you tell the police that?

A. No.  I didn't get the chance to tell the police anything.

. . .

Q. . . . The police report says that you stated that Nadine's daughter started to punch you outside the store, not inside the store?

A. I have no comment, sir.  I didn't even get the chance to talk to the police.  Except that I went and called the police.  They met me around in front of the thrift shop, went inside with me while I got my crutches.

The police wouldn't even talk to me.  I was nobody, I was told not to come back in the store, and the police talked to Nadine. He didn't say anything to me.

Desiree Reason Dep. at 42-43, 46-47.

The deposition testimony establishes that the police did respond to a

call regarding an incident at the thrift store; both Riley and Reason agree on

_____

[13] The police report is not in the certified record.

that. Accepting Reason's deposition testimony as true (despite its internal inconsistencies), a fact-finder might conclude that the police went to the thrift store in response to a call from Reason, rather than a call from Riley. But even if that is true, it does not establish that Riley did not call the police when she made the call from her cell phone. The record contains no police report or other evidence regarding what notice of the incident the police received. Riley's testimony that she called the police therefore remains undisputed.

In sum, Reason failed to present evidence sufficient to create a triable fact regarding breach of any duty by Appellees to summon aid to end the assault on Reason. The trial court therefore properly entered summary judgment in favor of Appellees on this claim.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/17/2017